UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>The Diocese of Buffalo, N.Y.,<br><br>    Debtor. | Case No. 20-10322 (CLB)<br><br>Chapter 11 |
| THE DIOCESE OF BUFFALO, N.Y.,<br><br>    Plaintiff,<br>v.<br><br>THE CONTINENTAL INSURANCE COMPANY, EMPLOYERS INSURANCE COMPANY OF WAUSAU (FORMERLY KNOWN AS EMPLOYERS INSURANCE OF WAUSAU A MUTUAL COMPANY FORMERLY KNOWN AS EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN), WAUSAU UNDERWRITERS INSURANCE COMPANY, SELECTIVE INSURANCE COMPANY OF AMERICA (FORMERLY KNOWN AS EXCHANGE MUTUAL INSURANCE COMPANY), NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, FIREMAN'S FUND INSURANCE COMPANY, CATHOLIC MUTUAL GROUP, AND THE NATIONAL CATHOLIC RISK RETENTION GROUP,<br><br>    Defendants. | Adv. Proceeding 20-1009 (CLB) |

**DECLARATION OF ATTORNEY JAMES R. MURRAY IN SUPPORT OF THE
<u>MOTION FOR RECONSIDERATION</u>**

Pursuant to 28 U.S.C. § 1746, JAMES R. MURRAY, ESQ., hereby declares and says as

follows:

1.  I am a partner of the law firm of Blank Rome LLP ("Blank Rome"), which is Special Insurance Counsel to the debtor The Diocese of Buffalo, N.Y. ("Diocese") in this case. This Declaration is filed in support of the Diocese's Motion for an order seeking reconsideration of the September 11, 2020 Decision and Order [Document 546].

### EXPERIENCE

2.  I am Chair of Blank Rome's policyholder-only Insurance Recovery Practice Group, which has received numerous group-wide and attorney-specific national recognitions.[1]

3.  I have 35 years of insurance coverage experience, representing exclusively policyholders against insurance companies. A significant portion of that experience involves pursuing coverage from general liability policies issued in the 1940's through the 1980's for environmental, asbestos, and other matters involving events that go back many years.

4.  I am also a trial lawyer and am a Fellow of the American College of Trial Lawyers.

5.  My work with sexual abuse coverage matters began in 2003, when I was retained by the Catholic Archdiocese of Seattle to advise regarding coverage for underlying claims of sexual abuse of minors.

6.  From 2003 through present, about half of my practice has involved insurance coverage for historical sexual abuse claims. I represented more than twenty-five such clients, including religious organizations, schools, and hospitals.

---

[1] Those announced since January 2020 include Law360's Insurance Practice of the Year (2019) (second year in a row), Benchmark Litigation's Insurance Firm of the Year (2020) and the National Law Journal's D.C. Litigation Department of the Year (Insurance) (2020) (second time in three years). Individually, I am ranked nationally in insurance by Chambers USA, as well as in Band 1 in Washington, D.C. Best Lawyers named me its 2020 "Lawyer of the Year" for Insurance Litigation in Washington, D.C. BTI Consulting Group designated me a 2019 "Client Service All-Star" for my work in insurance recovery for clients across the country.

7. Of those sexual abuse insurance coverage matters, I was Special Insurance Counsel for the debtors in the following chapter 11 proceedings, each having been resolved by way of a consensual plan derived through mediation consisting of both debtor contributions and also substantial insurance company contributions to a survivor trust: (1) *In re The Catholic Bishop of Spokane*, Case No. 04-08822 (Bankr. E.D. Wash. 2005); (2) *In re Society of Jesus, Oregon Province*, Case No. 09-30938 (Bankr. D. Or. 2009); (3) *In re Roman Catholic Bishop of Helena, Montana, a Montana Religious Corporation Sole (Diocese of Helena)*, Case No. 14-60074 (Bankr. D. Mont. 2014); (4) *In re Diocese of Duluth*, Case No. 15-50792 (Bankr. D. Minn. 2016); and (5) *In re The Diocese of New Ulm*, Case No. 17-30601 (Bankr. D. Minn. 2017).

8. I am presently Special Insurance Counsel for the debtors in the following ongoing chapter 11 proceedings: (1) *In re Archbishop of Agana, a Corporation Sole, Most Rev. Michael Jude Byrnes, Coadjutor Archbishop of Agana*, Case No. 19-00010 (Bankr. D. Guam 2019); (2) *In re Roman Catholic Church of the Archdiocese of Santa Fe*, Case No. 18-13027 (Bankr. D.N.M. 2018); (3) *In re The Diocese of Rochester*, Case No. 19-20905 (Bankr. W.D.N.Y., 2019); (4) *In re The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La. 2020); and (5) *In re The Roman Catholic Diocese of Syracuse, New York*, Case No. 20-30663 (Bankr. N.D.N.Y. 2020).

9. I am also coverage counsel to The Diocese of St. Cloud, which recently announced an agreement with survivors to fund a trust to compensate survivors, along with a commitment to file for chapter 11 bankruptcy protection, which it did on June 15, 2020, with a bar date of October 21, 2020. *In re The Diocese of St. Cloud*, Case No. 20-60337 (Bankr. D. Minn. 2020) [Docket No. 15]. I am also coverage counsel to the parishes in the Diocese of Winona chapter 11 bankruptcy proceeding. *In re Diocese of Winona-Rochester*, Case No. 18-

33707 (Bankr. D. Minn. 2018) and I previously served as insurance counsel for the Archdiocese of Seattle in an adversary proceeding in the Christian Brothers bankruptcy case. *In re The Christian Bros.' Institute,* Case No. 11-22820, Adv. Pro. Np. 13-08318 (Bankr. S.D.N.Y. 2012).

10. I presently represent several other Catholic entities regarding insurance coverage for historical sexual abuse claims, which have not filed for bankruptcy, including, for example, the Archdiocese of New York and Saint John's Abbey in Minnesota.

11. In each concluded bankruptcy case in which I have been involved, insurance contributions to the survivor trust were critical components of agreement on a consensual plan. In each case, the successful resolution was accomplished through a court ordered and supervised mediation process that involved all stakeholders – the debtor, the Creditor's Committee, the implicated insurance companies, the parishes and related Catholic entities of the debtor. Working with the insurance companies and with the survivor Creditors' Committees through mediation, is, in my experience, the best way to provide the greatest amount of compensation for the greatest number of survivors.

12. In every case, insurance was a critical component of the resolution. In none of the cases were the insurance issues actually litigated through trial of all the various issues that arose in these cases. In some cases (such as Santa Fe) there have been substantial mediation sessions undertaken and no insurance adversary proceeding has been filed. Every dollar spent on administrative expenses pursuing coverage litigation was likely one dollar less in contribution toward the survivor trust. Based on my experience, I respectfully submit that the Court's order [Docket 546] will likely result in a smaller survivor trust to the detriment of the sexual abuse claimants.

13. Consider two cases in contrast. In *In re Diocese of Duluth, Case No. 15-50792 (Bankr. D. Minn. 2016)*, there was active coverage litigation with one or two insurance

companies prior to a global resolution of the bankruptcy. *In re Diocese of Duluth*, Case No. 15-50792 (Bankr. D. Minn. 2016). The litigation did not proceed even close to trial and, indeed, fully resolved short of summary judgment arguments. The debtor's expenses for my firm as coverage counsel alone (not including expenses accounting for assistance from bankruptcy counsel, defense counsel, and debtor employees) was $1,659,152.18 in fees and $151,603.69 in costs (including experts, and depositions). On the other hand, in The Diocese of New Ulm bankruptcy, the debtor filed an insurance adversary proceeding and it was immediately stayed by agreement of the parties and proceeded to mediation. *In re The Diocese of New Ulm*, Case No. 17-30601, Adv. Pro. No. 17-03028 (Bankr. D. Minn., 2017) [Adv. Docket No. 5]. The insurance companies never filed answers. The case successfully resolved with the insurers paying $28 million toward a total pot of $34 million. The debtor's fees for insurance counsel, from beginning to end, was $532,787.28 and $8,074.88 in costs (no experts, no depositions). The Diocese of Duluth and the Diocese of New Ulm are part of the six (6) Dioceses located in Minnesota. Both Diocese are approximately the same size with a similar number of parishes. Victim claims in Duluth totaled one hundred twenty-five (125) and, in New Ulm, victim claims totaled one hundred and one (101).

14. I respectfully suggest that this case presents no insurance issues or disputes that were not also issues in every other chapter 11 case in which I am presently or was previously insurance coverage counsel to a religious entity facing many historical sexual abuse claims. There is nothing unique about the insurance portfolio in this case. Most of the insurance at issue in this and other cases is pre-1986 occurrence-based general liability insurance (this is because the sexual abuse exclusion was included in most general liability policies starting in the mid to late 1980s). In every such case, insurance companies raised numerous defenses relating to, among other things:

a) sufficient policy proof (not surprising given the age of the policies at issue);

b) how to apply the per-occurrence limits;

c) whether policies spanning three (3) years constitute three (3) separate policies for purposes of limits or provide one set of limits;

d) whether sufficient "bodily injury" has been alleged by the claimant;

e) whether the insured gave timely notice and, always;

f) whether the insured "expected or intended" the bodily injury at issue, thus precluding coverage.

15. In almost every such case, the court-appointed and court-supervised mediator *has addressed these issues as part of the global compromise or resolution process.* Some issues are worth a discount, and, some are not. A good mediator helps the parties see the weaknesses and strengths of their respective positions short of full-scale litigation.

16. For sure, insurance companies are entitled to a substantial amount of information as part of their claim evaluation. But that does not mean that a year or more of formal litigation, and all of the associated expense, is necessary or advisable. In many cases, consensual and mediator directed substantial discovery has been part of the mediation process. Mediators, with Court authority, have ordered appropriate disclosures and information for insurance companies to evaluate their "expected or intended" and other defenses. In a few cases, such as the Diocese of Duluth, discussed above, there was motion practice and discovery on discrete legal issues that were impediments to meaningful compromise between the debtor and the insurance company (in that case, more than one insurance company took a limiting opposition on how to calculate the per-occurrence limits). However, in the majority of cases, the parties have "argued" about, and compromised, the coverage positions as part of the mediation process.

17. If the Diocese of Buffalo is now forced to litigate the coverage adversary proceeding with the insurance companies for the next year, the cost to the estate will be substantial. The Diocese will be required to take both 30(b)(6) and fact depositions (of the insurance company underwriters, for example), hire multiple experts (i) regarding any policies that involve secondary evidence instead of the actual policy; (ii) concerning historical underwriting practices and standard form wordings; and (iii) to address expected or intended defenses asserted by the carriers. There will be affirmative motion practice confirming New York law on the number of occurrences issue. In addition to the already proposed written and document discovery, the insurance companies will attempt to take depositions on the "expected or intended" issue of former and present Diocese employees. For fact issues that remain in the litigation (which would include policy proof and Diocese expectation of damage) the case would be referred to the district court for remaining jury issues. Moreover, the insurance companies most likely will make a motion to withdraw the reference of the adversary proceeding on the ground that it is not a core-proceeding.

## **PARISH INSURANCE – PRE 1973**

18. The complexity and cost of any adversary proceeding will be exacerbated by issues involving parish policies. Prior to 1973, each parish of the Diocese was responsible for purchasing its own insurance coverage. For quite some time, the Diocese was concerned that there was no insurance coverage prior to 1973. In March 2020, fortunately, the Diocese discovered large volumes of annual reports from each of its parishes. Some reports contain insurance information while others do not have any at all. The Diocese then immediately worked with an insurance archeology firm to review and analyze the reports. For many policies, the insurance information includes the insurer's name, the approximate policy period, and the liability limits.

19. The Diocese and parishes are correlating CVA lawsuits as they are filed with the appropriate parish insurer(s) and providing notice of the CVA lawsuits to the insurer(s), if the insurers can be identified and remain solvent. To date, the Diocese and parishes have provided notice to 18 parish insurers (as a result of changes in the insurance industry some insurers are responsible for policies that were originally issued by various different insurance companies). In addition to notice of CVA lawsuits, the Diocese and Parishes included in their notice letters requests that the insurers search their records for information about historical parish insurance policies.

20. The parish insurers are likely to raise the same issues commonly raised by the insurers in chapter 11 cases. The issue of sufficient policy proof will likely predominate over other issues. The disputes over policy proof involving decades-old policies in any insurance case are typically fact intensive and entail extensive fact and expert witness testimony. Litigation over the policy proof issues with respect to the parish policies will be greatly complicated by the large number of companies that issued policies to the parishes. Some insurers sold policies to the parishes through various different subsidiary companies, while some insurers, due to consolidation in the insurance industry, became responsible for policies originally issued by different insurance companies. To date, the Diocese and parishes have provided notice to 18 parish insurers.

21. In most every other bankruptcy case in which I have been involved for religious entities facing many historical sexual case claims, these issues were addressed adequately, and much more efficiently, in the context of court ordered and supervised mediation the exchange of documents and information in the context of mediation is also for more streamlined and less expensive than formal discovery in an adversary proceeding. The mediator could assist the parties in securing sufficient information to make informed assessments of their respective

positions and that assessment drives, of course, how much the insurance companies are willing to contribute.

22. The mediation approach is being followed in currently pending chapter 11 cases involving religious entities. In the Diocese of Rochester bankruptcy filed in September 2019, the bar date passed in August 2020, and the Court referred the adversary proceeding to mediation. Mediation sessions are set for early October 2020. *In re The Diocese of Rochester*, Case No. 19-20905 (Bankr. W.D.N.Y., Feb. 25, 2020) [Docket No. 425]. All of the same issues are presented, with some of the same carriers, and the case is proceeding efficiently to mediation.

23. Based on all of the foregoing considerations, a year or more of full-scale insurance coverage litigation between the debtor and its insurance companies will negatively impact the Diocese's ability to recover from historical insurance policies, deplete its already limited assets, and thereby reduce the money available to compensate survivors' claims.

24. I declare under penalty of perjury that the foregoing is true and correct. Executed on September 28, 2020 in the District of Columbia.



James R. Murray, Esq.